IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTPORT INSURANCE CORPORATION f/k/a EMPLOYERS REINSURANCE CORPORATION, | ) ) ) ) CIVIL ACTION NO. |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| HEALTH CARE INDEMNITY, INC., | ) ) |
| Defendant. | ) ) |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Westport Insurance Corporation f/k/a Employers Reinsurance Corporation ("Westport") brings this complaint for declaratory judgment in its favor and against Defendant Health Care Indemnity, Inc. ("HCI"). In support thereof, Westport states and alleges as follows:

## NATURE OF THE CASE

1. This is a reinsurance dispute. Westport seeks a declaration that its facultative reinsurance certificate No. FCM-0645433-00-2002 issued to HCI for the period of January 1, 2002 to January 1, 2003 (the "Reinsurance Certificate"), is not triggered or implicated by HCI's demand for reinsurance coverage. A copy of the Reinsurance Certificate is attached as Exhibit "A."

2. The Reinsurance Certificate reinsures HCI Policy No. HCI-EX-10102-01 (the "HCI Excess Policy") for the risk that HCI had underwritten to its parent-insured, HCA, Inc. and, *inter alia*, its wholly-owned subsidiary, Teays Valley Health Care Services Inc. d/b/a Putnam General Hospital (collectively referred to as "HCA"), subject to the Reinsurance

Certificate's express terms and conditions. A copy of the HCI Excess Policy is attached as Exhibit "B."

3. The HCI Excess Policy provides coverage to HCA for $15 million per "occurrence" in excess of a $10 million per "occurrence" limit of liability represented by another, first layer HCI policy, No. HCI-10102 ("HCI Primary Policy"). Thus, although Westport reinsured only the HCI Excess Policy, in order to even potentially trigger Westport's obligations under the Reinsurance Certificate, HCI must present an insured "occurrence" involving HCA in excess of $10 million. A copy of the HCI Primary Policy is attached as Exhibit "C."

4. HCI seeks $15 million in coverage under the Reinsurance Certificate for a series of settlements that ended 107 of 122 separate medical malpractice and negligent credentialing lawsuits filed against HCA and other defendants in the Circuit Court of Putnam County, West Virginia (the "*King* Settlements"). Those lawsuits, known collectively hereafter as the *King* Litigation Claims, arose out of allegedly negligent and/or unnecessary orthopedic surgical procedures performed by Dr. John Anderson King and an assistant, David McNair, between November 18, 2002 and June 6, 2003. The specific procedures performed and the alleged injuries sustained varied from plaintiff to plaintiff in the 122 complaints filed in the *King* Litigation Claims.

5. HCI's demand for reinsurance can be viewed as follows:



6. For the reasons that follow in this complaint, Westport seeks a declaration that coverage under the Reinsurance Certificate is not available to HCI for any money paid by HCI in connection with HCA's defense and settlement of the *King* Litigation Claims.

7. Westport's grounds for declaratory relief include: (1) the lawsuits comprising the *King* Litigation Claims do not allege or constitute a single "occurrence" under the HCI Excess Policy or Reinsurance Certificate, such that the Reinsurance Certificate's $10 million per "occurrence" attachment point has not been triggered; (2) coverage under the Reinsurance Certificate is not available because HCI (and its parent-insured HCA) failed to satisfy a condition precedent to HCI's reinsurance coverage -- namely, to obtain Westport's prior written consent to settle the *King* Litigation lawsuits and to provide Westport a meaningful opportunity to participate in those settlement negotiations; (3) even if, *arguendo*, some of the allegations in the *King* Litigation Claims are deemed potentially related "occurrences," nearly all of the malfeasance giving rise to such lawsuits, including the granting of permanent credentials and privileges to Dr. King, occurred after the Reinsurance Certificate expired and thus do not constitute a covered "occurrence" under the Reinsurance Certificate arising within the policy period; (4) coverage under the Reinsurance Certificate is not available to the extent that the *King*

3

Litigation Claims arose out of fraudulent, willful or wanton acts by HCA, which are uninsurable under public policy and Tennessee law; and (5) to the extent Dr. King was not an employee of HCA, neither the HCI Excess Policy nor Reinsurance certificate apply to his acts.

## THE PARTIES

8. Plaintiff Westport is a Missouri corporation with its principal place of business located in Overland Park, Kansas. Westport is an insurance company that issues, *inter alia*, facultative and treaty-based reinsurance to insurer-cedents for the purpose of allocating the risk of certain insured liabilities.

9. Defendant HCI is a Colorado corporation with its principal place of business located in Nashville, Tennessee. Upon information and belief, HCI is a captive insurer wholly owned by HCA and issues primary and excess policies solely to HCA to guard against the risk of potential liability across multiple lines of exposure.

## RELEVANT NON-PARTIES

10. HCA is a Delaware corporation with its principal place of business located in Nashville, Tennessee. Upon information and belief, HCA is a leading provider of healthcare services, comprised of locally managed facilities that include about 164 hospitals and 106 freestanding surgery centers in 20 states and Great Britain and employing approximately 183,000 people.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the matter in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars ($75,000.00).

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a). HCI resides in this jurisdiction and regularly conducts business in this district.

13. HCI is subject to personal jurisdiction in Tennessee.

## BACKGROUND

### The Underlying Claims

14. HCA is the parent company of numerous subsidiaries and other affiliates that operate over 200 proprietary hospitals, surgery centers, and a variety of other health care facilities throughout the United States. One of those subsidiaries, Teays Valley Health Care Services Inc., owned and operated the Putnam General Hospital in West Virginia.

15. In November 2002, Putnam General Hospital granted initial temporary privileges to orthopedic surgeon Dr. John Anderson King, D.O., to practice medicine at its facility.

16. Following a second application and review, HCA granted Dr. King additional temporary privileges on January 16, 2003. Thereafter, following a third round of applications and review, HCA granted Dr. King permanent credentials to practice orthopedic medicine and perform surgeries at Putnam General Hospital on February 7, 2003.

17. Between November 2002 and June 2003, Dr. King performed approximately 500 operations, on *inter alia,* patients' spines, arms and legs.

18. Putnam General Hospital suspended Dr. King in or about June 2003, following multiple complaints by patients alleging malpractice and the performance of unnecessary surgical procedures.

19. In June 2003, the first of the 122 complaints that collectively comprise the *King* Litigation Claims was filed in the Circuit Court of Putnam County, West Virginia against Dr. King, Teays Valley Health Care Services Inc. d/b/a Putnam, HCA, Inc., and other defendants, arising out of allegedly negligent and/or unnecessary medical procedures performed by Dr. King and an assistant, David McNair, between November 18, 2002 and June 6, 2003.

20. These complaints contained a variety of claims and allegations against Dr. King, Putnam and HCA, including: (i) medical malpractice; (ii) negligent credentialing and supervision; (iii) trespass, assault and battery; (iv) civil conspiracy; (v) international and negligent infliction of emotional distress; (vi) outrage; fraud and deceit; (vii) joint venture and/or

5

joint enterprise; (viii) alter ego/piercing the corporate veil; and (ix) violations of corporate law and sham transactions.

21. The complaints also alleged that Dr. King's assistant, David McNair, improperly participated in the surgeries, resulting in numerous allegations of battery and trespass against him.

22. The 122 complaints comprising the *King* Litigation Claims were brought by separate individual plaintiffs, concerned separate medical procedures, and alleged individualized harm by Dr. King and Putnam/HCA. By way of example of the variety and independent nature of the many actions brought against Dr. King and HCA:

> ➢ The Adkins complaint alleges that "[i]n March 2003, King and McNair negligently performed open reduction and internal fixation of fifth metacarpal on the plaintiff Henry Adkins." *See Adkins v. King, et. al.* ¶ 8.

> ➢ The Merle Baker complaint alleges that "[o]n February 26, 2003, King and McNair performed a left bipolar shoulder arthroplasty with pain pump insertion. Plaintiff did not need a left shoulder replacement . . . ." *See Merle Baker v. King, et. al.* ¶ 8.

> ➢ The Sydney Baker complaint alleges that "[o]n February 11, 2003 plaintiff was admitted to Putnam General Hospital and came under the care of King. King declared the admission to be a neurological emergency because of intractable lumbar pain and inability to have normal gait and activities. . . Miraculously by February 14, 2003 the neurological emergency had ended because Workers Compensation had refused to pay for surgical intervention at that time . . . [On March 21, 2003] King and McNair performed an anterior interbody fusion of L4-L5 and L5-S1 with the insertion of an EBI bone stimulator allograft placement. . . The surgical procedure performed by King and McNair was unnecessary." *See Sydney Baker v. King et. al.* ¶ 8.

> ➢ The Workman complaint alleges that "[i]n January 2003, King and McNair performed on the plaintiff an anterior interbody fusion at L4-L5 and L5-S1, posterior lateral fusion of L4-L5 and L5-S1, bilateral foraminotomies of L4-L5 and L5-S1, and insertion of an EBI bone stimulator. The operative procedure was unnecessary. The use of Allomatrix without autologous bone graft material was a breach of the standard of care . . . .*See Workman v. King et. al.* ¶ 8.

> The Carter complaint alleges that "the defendants, acting jointly or severally, . . . negligently caused and/or allowed non-sterile surgical equipment to be utilized during . . . Carter's knee surgery . . . ." *See Carter v. King et. al.* ¶ 8.

23. In addition, the factual allegations in each of the complaints concluded with a boilerplate summary regarding the individual plaintiff's alleged damages:

> As a proximate result of the actions alleged in the counts against defendants, "Plaintiff [] has and will in the future suffer extreme pain, humiliation and embarrassment, and emotional distress and anguish; and will suffer psychological damages; has suffered permanent injuries and scarring; has and will in the future be prevented from engaging in normal activities; has and will in the future incur considerable medical and hospital expenses . . . .

*Id.* at ¶ 59.

24. Of the 122 complaint brought against HCA and Dr. King, approximately 109 involved procedures occurring *after* the Reinsurance Certificate expired on January 1, 2003 and over 106 involved procedures occurring *after* HCA reassessed and granted Dr. King temporary privileges and permanent credentials in January and February, 2003 -- also after the Reinsurance Certificate had expired.

25. While recognizing the disparate allegations of malpractice, conspiracy, trespass, etc. raised against Dr. King, Putnam and HCA in each of the 122 surgeries, the Circuit Court bifurcated the *King* Litigation Claims to try first the allegations regarding negligent credentialing and supervision.

26. During a four-week trial, the jury heard extensive evidence, including expert testimony, regarding Putnam General Hospital's decision to grant Dr. King privileges. The jury did not hear evidence regarding the individual allegations of malpractice. Nor did it hear evidence regarding damages.

27. On July 31, 2007, the jury found "by a preponderance of the evidence" that (1) Putnam General Hospital had failed to follow proper procedures in granting Dr. King temporary

7

privileges; (2) had Putnam General Hospital followed the required procedures, the hospital would not have granted privileges to Dr. King prior to his operating on any patient; and (3) Putnam General Hospital was "motivated by fraud, ill will, wantonness, oppressiveness, or by such reckless or gross negligence as to evidence a conscious disregard for the safety of the plaintiffs."

28. In a post-trial order, however, the Circuit Court ruled that "the negligent credentialing claim is not completely disposed." The Circuit Court explained that in order for a claim of negligent credentialing to be viable there must be a determination that medical malpractice occurred so as to provide "the requisite proximate cause for the negligent credentialing claim." Thus, the Circuit Court concluded, "it is imperative that medical malpractice be established for recovery to be had."

29. In 2008, before the Circuit Court reached any findings regarding malpractice, HCA -- through its captive-insurer HCI -- settled 107 of the *King* Litigation complaints for a combined amount in excess of its $10 million primary policy per occurrence limit. No individual settlement, however, breached the per-occurrence limit. In addition, HCA has purportedly incurred in excess of $23 million in defense costs.

## HCI's Demand for Reinsurance

30. Neither HCA nor HCI informed Westport of its intention to settle the *King* Litigation Claims. In fact, Westport was first informed of the *King* Settlements on or about August 15, 2008, well after they were finalized.

31. Eighteen months later, on or about April 30, 2010, HCI for the first time submitted its demand for reinsurance via correspondence from Larraine Gerelick, HCI's vice president of claims, to Westport's John S. Moore.

32. In that letter, Ms. Gerelick stated that HCI deemed the over 122 actions against its insured as a single "occurrence" under the HCI Excess Policy and Reinsurance Certificate. Given the amount of the settlements then in place, HCI demanded the Reinsurance Certificate's

8

full $15 million limit. A copy of HCI's initial demand letter is attached as Exhibit "D."

33. HCI's arguments were directly inconsistent with its previous statement on the non-relatedness of the 122 complaints in the *King* Litigation Claims, relied upon by Westport. Indeed, in communications with Westport in 2007 and prior to the claim being submitted in 2010, HCI affirmatively admitted that each action against Putnam General Hospital and Dr. King constituted a *separate occurrence*, subject to the HCI primary policy's $10 million per-occurrence limit.

34. For example, in confirming Westport's coverage position that the *King* Litigation lawsuits were not batched as a single occurrence under the Reinsurance Certificate, HCI explicitly stated that "you are correct. HCI's position is that [Westport's] coverage attaches at any claim exceeding $10 mill from a single plaintiff in the Putnam/King cases." *See* June 28, 2007 email from Larraine Gerelick to Galen Mussman attached hereto as Exhibit "E."

35. Thus, because no individual settlement came close to the $10 million per-occurrence limit, HCI agreed that HCI Excess Policy was not implicated and, therefore, the Reinsurance Certificate likewise was not implicated.

36. Westport timely responded to HCI's notice by letter dated May 14, 2010, setting forth its reservation of rights. In that letter, Westport requested that HCI set forth its coverage analysis, identified its counsel, and agreed to HCI's written request for a meeting with Westport to discuss HCI's claim. A copy of Westport's reservation of rights letter is attached as Exhibit "F."

37. On February 22, 2011, HCI sent a revised reinsurance demand letter, noting that its $15 million reinsurance demand was also subject to a sharing agreement between the companies that would ultimately reduce the amount paid for any covered claim. The *King* Litigation reinsurance demand still remained at $15 million, subject to such future reduction. A copy of HCI's revised demand letter is attached as Exhibit "G."

38. Following communications and discussions regarding the *King* Litigation Claims

9

between the parties, on October 3, 2012, 2012, Westport sent a second reservation of rights letter to HCI, and disclaimed coverage under the Reinsurance Certificate. A copy of Westport's October 3, 2012 letter is attached as Exhibit "H."

39. Given HCI's coverage positions and representations, it is clear that HCI seeks payment from Westport under the Reinsurance Certificate in connection with the claims made by HCA arising out of the *King* Settlements.

## The Insurance Agreements and Disputed Claims

40. During the January 1, 2002 to January 1, 2003 policy period, HCA was insured by:

- the HCI Primary Policy, a $10 million primary policy with HCI, its captive insurer;
- the HCI Excess Policy, a $15 million excess policy with HCI, its captive insurer; and
- an additional excess policy with XL Insurance Bermuda, Ltd. ("XL Policy"), which provided HCA with two layers of excess coverage (beyond the HCI Excess Policy) totaling $75 million.

41. The HCI Excess Policy follows form to the HCI Primary Policy, including the definition of the term "occurrence."

42. The HCI Excess Policy provides a per "occurrence" and aggregate Limit of Liability of $15 million, which is excess to the $10 million underlying coverage provided by the HCI Primary Policy.

43. Westport issued the Reinsurance Certificate to reinsure the HCI Excess Policy for the policy period of January 1, 2002 to January 1, 2003. Under the Reinsurance Certificate, Westport reinsured the risk assumed by HCI under the HCI Excess Policy, subject to the Reinsurance Certificate's express terms and conditions. The Reinsurance Certificate's Reinsured Policy Limits are $15 million for "each occurrence" and $15 million aggregate per location. *See* Ex. "A," Reinsurance Certificate, Endorsement No. 6.

44. Thus, in order to even potentially trigger Westport's obligations under the Reinsurance Certificate, HCI must present covered loss related to a single "occurrence" taking

10

place between January 1, 2002 to January 1, 2003 in excess of $10 million, which would implicate the reinsured HCI Excess Policy.

45. Westport's Reinsurance Certificate is an independent contract. It does not contain a "follow the fortunes" clause and Westport is not bound by HCI's claims analysis or coverage determinations.

46. Despite being filed by 122 separate patients and relating to 122 different surgical procedures arising on different dates, under different circumstances and settling for different amounts, and despite the fact that Dr. King's temporary privileges and permanent credentials were considered and granted after the expiration of the Reinsurance Certificate, HCI has taken the position that the complaints comprising the *King* Litigation Claims are somehow related so as to constitute a single "occurrence" under the HCI Policies subject to a single self-insured retention and per "occurrence" limit.

47. Coverage is not available under the Reinsurance Certificate for the *King* Settlements or defense.

48. Westport and HCI have a present and immediate dispute as to whether Westport owes HCI any amount under the Reinsurance Certificate.

49. The issues raised herein will directly govern the parties' rights and obligations, if any, under the Reinsurance Certificate. A declaration of the proper interpretation of the Reinsurance Certificate is necessary to resolve the controversy between Westport and HCI and settle any uncertainty as to the parties' rights and obligations with respect to the settled *King* Litigation Claims.

50. There is no other form of proceeding that can provide Westport with the immediate declaratory relief it seeks with respect to this coverage dispute with HCI.

51. This matter is, therefore, ripe for adjudication.

# COUNT I – DECLARATORY JUDGMENT
# COVERAGE HAS NOT BEEN TRIGGERED
# UNDER THE REINSURANCE CERTIFICATE

52. Westport incorporates the foregoing paragraphs as if set forth fully herein.

53. By its terms, coverage under the Reinsurance Certificate is implicated only if HCI is required to pay covered "loss" for a single "occurrence" that exceeds $10 million and therefore triggers the HCI Excess Policy. The Reinsurance Certificate adopts the HCI Primary Policy health care professional liability coverage section's definition of "occurrence" to determine whether this coverage threshold is met.

54. Pursuant to the HCI Primary Policy, HCI "will pay on behalf of the Insured all sums which the Insured shall become legally liable to pay as damages because of Injury caused by an 'occurrence' during the policy period [January 1, 2002 to January 1, 2003]." *See* HCI Primary Policy, Article I.

55. In relevant part, the HCI Primary Policy defines "occurrence" as:

> an act or omission or related series of acts or omissions, arising out of the provision of, or failure to provide, health care services.

*Id.*, Article V.

56. "[H]ealth care services" is defined by the HCI Primary Policy as:

> (1) the furnishing of professional services to patients including the furnishing of food, beverages, medications or appliances in connection with such services and the post mortem handling of human bodies, or
>
> (2) service by any persons as members of a formal accreditation, peer review, utilization review, standards review or similar professional board or committee of the named Insured or as a person charged with executing the directives of such board or committee.

*Id.*

57. The HCI Primary Policy further provides that:

12

> [f]or the purpose of determining the limit of the Company's
> liability, all injury arising out of related or similar circumstances or
> events shall be considered as arising out of one occurrence or
> interrelated occurrences.

*Id.*

58. None of the 122 lawsuits comprising the *King* Litigation Claims settled for greater than $10 million. Therefore, Westport's obligation to indemnify HCI for the *King* Settlements can only arise if the allegations of *King* Litigation Claims are considered to be interrelated and constituting a single defined "occurrence" under the Reinsurance Certificate.

59. Under Tennessee law, the *King* Litigation Claims settled through the *King* Settlements do not constitute a single "occurrence" resulting in "loss" in excess of $10 million under the Reinsurance Certificate.

60. Westport's Reinsurance Certificate is an independent contract and does not contain a "follow the fortunes" clause. Indeed, in addition to containing its own conditions and exclusions, under the Reinsurance Certificate, Westport expressly reserved its right:

> . . . at its own expense, with the full cooperation of the
> Reinsured to appoint additional counsel and to participate
> jointly with the Reinsured and its Representatives in the
> investigation, adjustment, negotiation or defense of claims
> to which, in the judgment of the Corporation, it is or might
> become exposed.

*See* Reinsurance Certificate at Sec. V (Claims).

61. Therefore, Westport is not bound by any claims or coverage determination by HCI.

62. In addition, as the reinsured-cedent, HCI owed Westport the duty of utmost good faith to properly and professionally adjust all claims and to disclose and communicate to Westport all facts and information potentially implicating the Reinsurance Certificate.

63. HCI has not acted in the utmost good faith in determining whether coverage exists under its policies or in its handling of HCA's coverage request.

13

64. Westport is entitled to a judicial declaration that the Reinsurance Certificate does not provide any coverage to HCI for any reinsurance claim related to HCA's defense and settlement of the *King* Litigation Claims.

### COUNT II – DECLARATORY JUDGMENT
### THE REINSURANCE CERTIFICATE REQUIRED THAT WESTPORT CONSENT TO THE *KING* SETTLEMENTS AS A CONDITION PRECEDENT TO HCI'S REINSURANCE COVERAGE

65. Westport incorporates the foregoing paragraphs as though fully set forth herein.

66. In relevant part, the Reinsurance Certificate provides:

> The Reinsured [HCI] agrees that it will investigate and will settle or defend all claims arising under the Reinsured Policy. The Reinsured will give prompt, written notice to the Corporation [Westport], by means other than bordereaux or loss runs, of any event, occurrence, medical incident, event or subsequent development, and any type of injury or reserve that is required to be reported under the Reinsured Policy, which, irrespective of liability, have a reasonable possibility of resulting in a claim for indemnity hereunder. The Reinsured will forward promptly to the Corporation copies of such pleadings and reports of investigation as may be requested by the Corporation. **As a condition precedent to indemnification hereunder, the Reinsured shall notify and obtain the prior written approval of the Corporation of any payment or offer of settlement for any claims that would involve indemnification under this certificate. Notice to the Reinsured by any insured does not constitute notice to the Corporation.**

*See* Reinsurance Certificate at Sec. V (Claims) (emphasis added).

67. This condition precedent was negotiated at arms length by Westport and HCI, itself a sophisticated insurer. It was drafted to allow Westport an opportunity to participate in any settlement negotiations and consent to any settlement by HCI and its parent-insured, HCA, that could potentially implicate the coverage agreed to by Westport and HCI in the Reinsurance Certificate.

14

68. Further, the Reinsurance Certificate provides that Westport was entitled to evaluate and participate in the settlement of the *King* Litigation Claims. To that end, the Reinsurance Certificate provides:

> The Corporation shall have the right, at its own expense, with the full cooperation of the Reinsured to appoint additional counsel and to participate jointly with the Reinsured and its Representatives in the investigation, adjustment, negotiation or defense of claims to which, in the judgment of the Corporation, it is or might become exposed.

*See* Reinsurance Certificate at Sec. V (Claims).

69. Neither HCI nor HCA informed Westport that they were prepared to settle the *King* Litigation Claims until after HCA and HCI had already agreed to settle those actions Litigation beginning in May 2008.

70. Westport did not give HCI or HCA consent to settle the *King* Litigation Claims prior to HCI settling the *King* Litigation Claims.

71. The failure to seek Westport's prior written consent before HCI and HCA settled the *King* Litigation Claims, particularly when coupled with HCI's express prior-statement that the Reinsurance Certificate would not be triggered by the *King* Litigation Claims given the individual value of each of the claims, violates the explicit condition precedent to coverage and prejudiced Westport's rights under the Reinsurance Certificate, thus voiding coverage.

72. Westport is entitled to a declaration that no coverage exists under the Reinsurance Certificate for any claim made by HCI related to HCA's defense and settlement of the *King* Litigation Claims.

## COUNT III -- DECLARTORY JUDGMENT
## THE REINSURANCE CERTIFICATE APPLIED
## ONLY TO OCCURENCES ARISING DURING THE POLICY PERIOD

73. Westport incorporates the foregoing paragraphs as though fully set forth herein.

74. The Reinsurance Certificate, the HCI Excess Policy and HCI Primary Policy all apply coverage on an "occurrence" basis. As such, any "occurrence" falling outside of the January 1, 2002 to January 1, 2003 policy period of the Reinsurance Certificate would not trigger coverage, unless it somehow related back to an initial occurrence that arose during the policy period. Indeed, the Reinsurance Certificate expressly states that it reinsures "loss events or occurrences taking place during the certificate period."

75. On information and belief, Dr. King performed approximately 109 -- or roughly 90% -- of the surgeries giving rise to the *King* Litigation Claims *after* the Reinsurance Certificate expired on January 1, 2003. Indeed, only a fraction of the total amount paid in the *King* Settlements resolved occurrences taking place during the certificate period.

76. Moreover, while Dr. King first received temporary privileges in November 2002, HCA performed subsequent formal assessments of Dr. King's qualifications, following his submission of additional applications, and granted Dr. King temporary privileges and permanent credentials on January 16, 2003 and February 7, 2003 -- after the Reinsurance Certificate had expired. Each constitutes a separate occurrence.

77. There is no single "occurrence" during the policy period that resulted in "loss" in excess of $10 million.

78. Westport is entitled to a judicial declaration that the Reinsurance Certificate does not provide any coverage to HCI for any reinsurance claim related to any of Dr. King's surgeries and related allegations occurring after January 1, 2003.

## COUNT IV – DECLARATORY JUDGMENT
## THE UNDERLYING CONDUCT
## CONSTITUTED FRUADULENT OR WANTON ACTS,
## WHICH ARE UNINSURABLE UNDER PUBLIC POLICY AND TENNESEE LAW

79. Westport incorporates the foregoing paragraphs as though fully set forth herein.

80. The jury in the *King* Litigation Claims found that Putnam was "motivated by

16

fraud, ill will, wantonness, oppressiveness, or by such reckless or gross negligence as to evidence a conscious disregard for the safety of the plaintiffs."

81. It is against public policy and Tennessee law for fraudulent, intentional, willful or wanton conduct to be insurable.

82. Westport is entitled to a judicial declaration that the Reinsurance Certificate does not provide any coverage to HCI for any reinsurance claim arising out of fraudulent and wanton conduct.

## COUNT V – DECLARATORY JUDGMENT
## THE REINSURANCE CERTIFICATE DOES NOT
## APPLY TO THE EXTENT DR. KING WAS NOT AN EMPLOYEE OF HCA

83. Westport incorporates the foregoing paragraphs as though fully set forth herein.

84. The HCI Excess Policy specifically excludes coverage of non-employees:

> [This policy shall not apply] to any liability arising out of acts or omissions in the rendering of, or failure to render, healthcare services by physicians, surgeons, and dentists not employed by the Named Insured unless such individual is a "Person Insured" as defined in the policy, or unless coverage is afforded under the definition of "Incidental Contract."

HCI Excess Policy, Article IV, § 6.

85. It appears that while Dr. King was credentialed by Putnam General Hospital, he might not have been an employee.

86. To the extent that Dr. King was not an employee of HCA or Putnam General Hospital, Westport is entitled to a judicial declaration that the Reinsurance Certificate does not provide any coverage to HCI for claims covered by the non-employee exclusion because the HCI should have rejected this coverage in the first instance.

## PRAYER FOR RELIEF

17

WHEREFORE, pursuant to 28 U.S.C. § 2201, *et seq.*, Plaintiff Employers Reinsurance Corporation n/k/a Westport Insurance Corporation requests that judgment be entered in its favor and against Defendant Health Care Indemnity, Inc. Westport further requests that this Court:

A. Determine, decide, adjudicate and declare the rights and liabilities of the parties with respect to the Reinsurance Certificate;

B. Determine, decide, adjudicate and declare that there is no coverage under the Reinsurance Certificate for any claim presented by HCI for reinsurance related to HCA's defense and settlement of the *King* Litigation Claims; and

C. Award Westport all costs and expenses incurred in this matter, and grant any such other and further relief that this Court deems just and proper.

Dated: December 16, 2012.

Respectfully submitted,

By: _____
William H. Tate, Esq.
Howard, Tate, Sowell, Wilson, Leathers & Johnson, PLLC
201 Fourth Avenue North, Suite 1900
Nashville, Tennessee 37219
(615) 256-1125
(615) 244-5467 Fax

*Of Counsel* (to be admitted *pro hac vice*):

Ronald P. Schiller
Daniel J. Layden
Hangley Aronchick Segal & Pudlin & Schiller LLP
One Logan Square
18th and Cherry Streets, 27th Floor
Philadelphia, PA 19103
Telephone 215.568.6200
Fax 215.568.0300

Attorneys for Plaintiff,
Westport Insurance Corporation f/n/a Employers Reinsurance Corporation